AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Acer Aspire E5-575 Model Number: N16Q2 Serial ) Case No.
Number: NXGHGAA001633047C27600 )
)

**FILED**
MAR 2 6 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

**19MJ1246**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-1.

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 952 and 960 | Importation of Controlled Substances |

The application is based on these facts:
See Affidavit of HSI Special Agent Khalid Avila-Williams, which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Khalid Avila-Williams, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/25/19

*Judge's signature*

City and state: San Diego, CA    Hon. Bernard G. Skomal U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Khalid Avila-Williams, a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations (HSI), being duly sworn, declare and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant for (1) a Acer Aspire Laptop, bearing serial number NXGHGAA001633047C27600 (**Target Device 1**), and (2) a Motorola Phone, FPF No. 2019250400071701, Line Item No. 3 (**Target Device 2**)[1] (collectively, the **Target Devices**), which were seized from the vehicle of Saul Fernando ALVARADO Zapata, on or about February 9, 2019, pursuant to his arrest for importing cocaine in violation of 21 U.S.C. §§ 952 and 960. The **Target Devices** are further described in Attachments A-1 and A-2 (incorporated herein by reference). The **Target Devices** are currently in the possession of Homeland Security Investigations located at 880 Front Street, San Diego, California 92101, in the Southern District of California.

2. I seek authority to search the **Target Devices** for and seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 952 and 960 (Importation of Controlled Substances), as described in Attachment B (incorporated herein by reference) for the time period from December 1, 2018, to February 10, 2019.

3. Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review

---

[1] At the time of his arrest, ALVARADO provided consent to search **Target Device 2** and another phone in his possession and provided PIN codes. The United States was unable to obtain a download of **Target Device 2** at the border and, as such, seeks a warrant for that purpose. ALVARADO declined to consent to a search of **Target Device 1** because he claimed that it contains intimate photos. Information obtained from the search of ALVARADO's cellular telephones has not been included herein to support probable cause.

of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates, times and amounts are approximate.

## EXPERIENCE AND TRAINING

5. I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations (HSI). I am currently assigned to the HSI San Diego Office. I have been a full-time, sworn federal agent with HSI since 2018. Prior to my employment with HSI, I was employed by the Florida Division of Alcoholic Beverages and Tobacco as a Special Agent and later promoted to the rank of Lieutenant. In that role, I served as a Criminal Investigator for over 10 years and conducted numerous narcotics, vice, intellectual property, and financial investigations. Additionally, for approximately two years, I was employed as a United States Probation Officer in the Northern District of Texas. During my employment, I conducted numerous interviews with persons on supervised release, provided written and oral status reports to sentencing judges, and provided court testimony.

6. I have completed extensive criminal investigation training at the Federal Law Enforcement Training Center in Glynco, Georgia, including training in conducting narcotics smuggling investigations and training in the methods, devices, and practices common to individuals and organizations who smuggle narcotics and narcotics proceeds. I also have completed training in computers and data through various courses in electronic law and evidence and other training about the investigative uses of data and how it might be found. Additionally, I have completed training at the Federal Law Enforcement Training Center in Charleston, South Carolina.

7. In my role as a Special Agent, I have conducted and participated in numerous investigations of criminal laws, including laws related to narcotics violations. In these investigations, I have conducted searches, seizures, and arrests. Additionally, I have been

cross-designated by the Drug Enforcement Administration (DEA) and empowered to investigate and make arrests for offenses under Title 21 of the United States Code. Through my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds. I am aware that it is a common practice for drug traffickers to work in concert with other individuals and to do so by utilizing digital devices such as cellular telephones, tablets, and computers to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involved in the smuggling and trafficking of drugs generate many types of evidence, including but not limited to, digital evidence such as telephone call logs, email messages referring to the arrangements of travel and payment, and names, photographs, text messaging, and contact information for co-conspirators.

    8.    Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics investigations, I am also aware that:

    a.    Drug traffickers and their co-conspirators often use digital devices like cellular telephones, tablets, and laptop computers to communicate with persons who transport their narcotics and/or drug proceeds;

    b.    Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are mobile and they have instant access to telephone calls, text, web, email, and voice messages;

    c.    Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

    d.    Drug traffickers and their accomplices will use digital devices like cellular telephones, tablets, and laptop computers because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

  e. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

  f. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings;

  g. Individuals involved in drug trafficking often utilize digital devices like cellular telephones, tablets, and laptop computers with photograph and video capabilities to take and send photographs and videos of other members of criminal organizations, drugs, criminal proceeds, and assets purchased with criminal proceeds; and

  h. The use of digital devices like cellular telephones, tablets, and laptop computers by traffickers tends to generate evidence that is stored on the digital devices, including but not limited to, emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

## PROBABLE CAUSE

9. On or about February 9, 2019, at approximately 10:00 a.m., ALVARADO applied for entry into the United States at the San Ysidro, California, Port of Entry. ALVARADO was the registered owner and driver of a white 2013 Nissan Juke with Mexican License plate APL-381-A. A canine alerted to the undercarriage of the vehicle in pre-primary. ALVARADO gave two negative Customs declarations and claimed ownership of everything in the vehicle. The vehicle was referred to secondary inspection.

10. In secondary inspection, anomalies on the rear passenger floor area of the vehicle were detected using the Z Portal machine, and a density meter received a high reading in the same area. After removing the two front seats from the vehicle, the carpet was pulled back and a non-factory compartment underneath the passenger seat was

4

discovered. Packages were observed inside through a small aperture in the metal. After the compartment was opened, a total of six packages were removed weighing approximately 13.32 kilograms (29.36 pounds). Two of the packages were field tested and tested positive for the properties of cocaine.

11. ALVARADO was placed under arrest for violation of 21 U.S.C. §§ 952 and 960. The **Target Devices** were found in his vehicle and seized subsequent to his arrest.

12. Post-arrest, ALVARADO waived his *Miranda* rights and agreed to answer questions. He stated that he was contacted through Facebook and subsequently hired to transport currency into the United States. ALVARADO also stated that he communicated with his recruiter through the WhatsApp messaging platform. ALVARADO advised that he met at a shopping plaza in Tijuana, Mexico for an interview. He was scheduled to receive $3,000.00 as payment. ALVARADO also stated that he was instructed to download the mobile application Life 360 for tracking purposes.

13. ALVARADO further stated that, on the date of the offense, he met at the above referenced plaza and dropped off his vehicle to be loaded. ALVARADO claimed that he knew nothing about the secret compartment contained within the vehicle, and also later claimed the vehicle was not his. Instead, he claimed that he was given the vehicle for purposes of the offense in December 2018 or January 2019.

14. ALVARADO also stated that he had photos on **Target Device 1**, which had been transferred from a phone, that could identify his point of contact. ALVARADO later claimed that the transferred photos were instead on a computer at his residence. ALVARADO also stated that he had purchased **Target Device 2** for Wi-Fi purposes.

15. Based upon my experience and investigation in this case, I believe that ALVARADO, as well as other persons yet unknown, were involved in an on-going conspiracy to import, possess, and distribute cocaine into and within the United States from Mexico. Based on my experience investigating drug traffickers, I also believe that ALVARADO used the **Target Devices** to coordinate with co-conspirators regarding the trafficking of controlled substances and to further this conspiracy both inside and outside

the United States. I also know that logs of calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text and web-based messages, pictures, and other digital information are stored in the memory of digital devices, like cellular telephones, tablets, and laptops, which may identify other persons involved in drug trafficking activities.

16. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotic trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotic trafficking activities of ALVARADO and co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices** described herein.

17. I am aware that drug conspiracies require detailed and intricate planning to successfully evade detection by law enforcement. In my professional training and experience, this may require planning and coordination in the days and weeks prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of their valuable cargo. Based on my training and experience, individuals such as ALVARADO will attempt to minimize the amount of time they were involved in their smuggling activities and often times are actually involved for weeks and months longer than they claimed to be involved. Given this, as well as ALVARADO's statement that he received the vehicle for purposes of his illegal activity in December 2018 or January 2019, I respectfully request permission to search the **Target Devices** for the time period from December 1, 2018, to February 10, 2019.

//
//
//

6

# METHODOLOGY

**A. Target Device 1**

18. With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures on **Target Device 1** and any data contained therein that is subject to seizure pursuant to this warrant:

### Forensic Imaging

a. The executing agents will obtain a forensic image of **Target Device 1**. A forensic image is an exact physical copy of the hard drive or other media. A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data. Absent unusual circumstances, it is essential that a forensic image is obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. After verified images have been obtained, **Target Device 1** will be returned to HSI absent further application to this court.

### Identification and Extraction of Relevant Data

b. After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment, and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

  c. Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail databases and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

    d.    It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

    e.    Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling. For example, a single megabyte of storage space is roughly equivalent to 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent to 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and

9

results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

f. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application to this court.

g. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

### Genuine Risks of Destruction

19. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills.

### Prior Attempts to Obtain Information

20. The United States has not attempted to obtain this information by other means.

**B.   Target Device 2**

21. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model, and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and

rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

22. Following the issuance of this warrant, I will collect **Target Device 2** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory card will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

23. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days, absent further application to this court.

## CONCLUSION

24. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude that ALVARADO used the **Target Devices** to facilitate the offense of importing cocaine. The **Target Devices** were likely used to facilitate the offense by transmitting and storing data, specifically that described in Attachment B, which

11

constitutes evidence of violations of 21 U.S.C. §§ 952 and 960. I also believe that probable cause exists to believe that evidence of illegal activity committed by ALVARADO continues to exist on the **Target Devices** as described in Attachments A-1 and A-2. Therefore, I respectfully request that the Court issue this warrant.

    I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Khalid Avila-Williams, Special Agent
Homeland Security Investigations

Sworn to and subscribed before me this __25__ day of March, 2019.

_____
HONORABLE BERNARD G. SKOMAL
United States Magistrate Judge

12

## ATTACHMENT A-1

### PROPERTY TO BE SEARCHED

The property to be search in connection with an investigation of violations of Title 21, United States Code, Sections 952 and 960 is described below:

> Acer Aspire E5-575
> Model Number: N16Q2
> Serial Number: NXGHGAA001633047C27600
> **(Target Device 1)**

**Target Device 1** is currently in the possession of:

Homeland Security Investigations
880 Front Street
San Diego, California 92101

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

Authorization to search the **Target Devices** described in Attachments A-1 to A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the electronic devices. The seizure and search of the **Target Devices** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Devices** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third party applications, photographs, audio files, videos, and location data, for the period of December 1, 2018, up to and including February 10, 2019:

   a. tending to indicate efforts to smuggle currency or controlled substances into the United States from Mexico or transport currency or controlled substances within the United States;

   b. tending to identify accounts, other facilities, storage devices, or services – such as email addresses, IP addresses, and phone numbers – that may contain electronic evidence tending to indicate efforts to smuggle currency or controlled substances into the United States from Mexico or transport currency or controlled substances within the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in efforts to smuggle currency or controlled substances into the United States from Mexico or transport currency or controlled substances within the United States;

   d. tending to identify travel to or presence at locations involved in the smuggling of currency or controlled substances into the United States from Mexico or transporting currency or controlled substances within the United States, such as drop off and pick up locations, stash houses, load houses, or delivery points;

    e.    tending to indicate payment for the smuggling of currency or controlled substances into the United States or the transportation of currency or controlled substances within the United States;

    f.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

    g.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Section 952 and 960.